IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| SPORTVISION, INC., | NO. C 04-03115 JW |
| Plaintiff, | |
| v. | **ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| SPORTSMEDIA TECHNOLOGY CORPORATION, | |
| Defendant. | |

## I. INTRODUCTION

At issue in this case are the rights to a virtual yellow first-down line used in football game broadcasts. In March of 2000, Plaintiff Sportvision, Inc. ("Plaintiff") obtained a trademark on the color yellow for enhancing the video images of others by adding a yellow line to denote a location of interest in the broadcast of a football game. When a competing vendor, SportsMEDIA Technology Corporation ("Defendant") started to offer virtual first-down indicator technology, Plaintiff initiated this lawsuit against Defendant. Presently before the Court is Defendant's Motion for Partial Summary Judgment on the trademark issues (hereinafter "Defendant's Motion," Docket Item No. 97). On April 27, 2005, the Court held a hearing regarding Defendant's Motion. Based upon the arguments advanced by counsel at the hearing and in their briefs, and for the reasons set forth below, the Court GRANTS Defendant's Motion.

## II. BACKGROUND

Plaintiff and Defendant provide a virtual yellow line first-down indicator for football games. There are three major vendors that provide the virtual first-down line technology to television networks: Plaintiff Sportvision, Defendant SportMEDIA, and PVI Virtual Media Services, LLC ("PVI"). Before awarding a contract to a vendor, the networks engage in a comprehensive selection process. A vendor provides a network with a face-to-face technical demonstration, and networks engage in research, development, and testing before selecting a vendor. Networks have discretion over the color and have dictated the color of Plaintiff's and Defendant's first-down indicator. The networks' discretion over the color has been specified in its contracts.

In 1998, Plaintiff provided its first technical demonstration of its virtual line technology to ESPN. During this demonstration, Plaintiff offered ESPN many different colors for the network to choose from, including red, orange, yellow and blue. ESPN, and later other networks, selected yellow as the color for the virtual first-down indicator. Since the introduction of the virtual line technology, it has become very popular among the football viewing public.

In March of 2000, Plaintiff applied for a U.S. Trademark Registration of the color yellow for enhancing the video images for others by adding an electronic visual display or graphic, namely, a line, which denotes a location of interest in an image, a video or a broadcast of a football game. The official description of the mark printed on the registration certificate reads:

> The mark consists of the color yellow used on a virtual line that appears as an image on a football field during a television or video broadcast of a football game. The portion of the drawing in dotted lines depicts a portion of an image of a football field including line markers, and serves to show positioning of the mark. The drawing is lined for the color yellow.

(First Amended Verified Complaint for Patent Infringement, Trademark Infringement and Unfair Competition, Ex. D, Docket Item No. 4.) The U.S. Patent and Trademark Office ("PTO") issued U.S. Trademark Registration No. 2,622,916 to Plaintiff on September 24, 2002.

In the Fall of 2003, Plaintiff became aware that Defendant was providing a virtual yellow first-down indicator to certain college football broadcasts. Plaintiff advised Defendant of Plaintiff's intellectual property rights and requested that Defendant not infringe such rights. Plaintiff then learned

2

in June 2004 that Defendant had offered an allegedly infringing service for the 2004 ABC Monday Night Football schedule. Again, Plaintiff demanded that Defendant cease the alleged infringement.

On July 30, 2004, Plaintiff initiated the instant suit. On August 2, 2004, Plaintiff learned that Defendant's virtual yellow line first-down indicator was being used in a pre-season special version of ABC Monday Night Football. Plaintiff filed a motion for preliminary injunction to prevent consumer confusion and to protect its trademark from alleged infringement by Defendant, a direct competitor. On September 2, 2004, the Court denied Plaintiff's request for preliminary injunction.

On February 28, 2005, Defendant filed its Motion for Partial Summary Judgment on the trademark issues, arguing that Plaintiff's trademark infringement claim fails as a matter of law because Plaintiff has no valid trademark. On April 27, 2005, the Court held a hearing regarding Defendant's Motion. Based upon the arguments advanced by counsel at the hearing and in their briefs, and for the reasons set forth below, the Court GRANTS Defendant's Motion.

### III. STANDARDS

**A. Summary Judgment**

The requirements for granting summary judgment are well established: there must be no genuine issues as to any material fact and the party receiving judgment must be entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). Summary judgment should be granted when the pleadings, depositions, together with the affidavits, if any, show that there is no genuine issue as to any material fact. Id.; see also Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000). The movant is not obliged to show that a fact necessary to the nonmovant's case is untrue, but it must show the record does not contain sufficient evidence that the fact is true. Celotex Corp. v. Catrett, 477 U.S. 317, 324-25 (1986). The nonmovant, in turn, may not rest on the allegations in the pleadings, but must introduce evidence that designates specific facts showing that there is a genuine issue for trial. Celotex, 477 U.S. at 324; T.W. Electrical Service, Inc. v. Pacific Electrical Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

//

**B. Trademark Infringement**

In a trademark infringement action, the Plaintiff has the ultimate burden of persuasion. Tie Tech, Inc. v. Kinedyne Corp., 296 F.3d 778, 783 (9th Cir. 2002). To prevail on a trademark infringement action, the Plaintiff must demonstrate that (1) it has a protectable trademark, and (2) the Defendant's use of the same or similar mark is likely to confuse consumers. See Rachel v. Banana Republic, 831 F.2d 1503, 1506 (9th Cir. 1987) (citing Fuddruckers, Inc. v. Doc's B.R. Others, Inc., 826 F.2d 837, 841 (9th Cir. 1987).

## IV. DISCUSSION

**A. Validity of the Mark**

Plaintiff attempts to demonstrate a valid mark via the presumption of validity garnered by its PTO registration. Defendant attempts to rebut Plaintiff's prima facie evidence of the mark's validity by claiming that Plaintiff's mark is functional and has not attained secondary meaning. For the reasons set forth below, Defendant has not only presented evidence of functionality sufficient to overcome the evidence of prima facie validity, but Plaintiff has also failed to raise a genuine issue of material fact.

**1. Presumption of Validity**

When a plaintiff receives a federal trademark registration from the PTO, he is entitled to a presumption that the mark is valid. The Lanham Act provides that a trademark registration is "prima facie evidence of the validity of the registered mark and . . . of the registrant's exclusive right to use the registered mark." 15 U.S.C. § 1115(a). A trademark registration "shifts the burden of proof from the plaintiff, who would have to establish his right to exclusive use in a common law infringement action, to the defendant, who must introduce sufficient evidence to rebut the presumption of plaintiff's right to such protected use." Vuitton et Fils S.A. v. J. Young Enters., Inc., 644 F.2d 769, 775 (9th Cir. 1981). The burden of proof for rebutting a registered trademark's presumption of validity is by a preponderance of the evidence. Vuitton, 644 F.2d at 776; see also Door Sys., Inc. v. Pro-Line Door Sys., Inc., 83 F.3d 169, 172 (7th Cir. 1996) ("The presumption . . . evaporates as soon as evidence of invalidity is presented . . . . Its only function is to incite such evidence and when the function has been

4

performed the presumption drops out of the case.") (citations omitted). To rebut a plaintiff's prima facie evidence of the mark's validity, a defendant in an infringement action may raise an affirmative defense of invalidity based on a mark's functionality. See 15 U.S.C. § 1115(b)(8). Once the presumption of validity is overcome, however, the mark's registration is merely evidence of registration, nothing more. Tie Tech, 296 F.3d at 783.

Plaintiff's U.S. Trademark Registration No. 2,622,916 is prima facie evidence that Plaintiff's mark is valid. The registration is for a mark "consist[ing] of the color yellow used on a virtual line that appears as an image on a football field during a television or video broadcast of a football game. The portion of the drawing in dotted lines depicts a portion of an image of a football field including line markers, and serves to show positioning of the mark." When a plaintiff receives a federal trademark registration from the PTO, he has established "prima facie evidence of the validity of the registered mark and . . . of [his] exclusive right to use the registered mark." 15 U.S.C. § 1115(a). This registration shifts the burden of proof to rebut the presumption of Plaintiff's right to such protected use.

### 2. Rebutting the Presumption of Validity

In rebutting this presumption, Defendant contends that Plaintiff's mark does not serve as a trademark because the mark is functional. Although functionality is generally viewed as an intensely factual issue, Vuitton, 644 F.2d at 775, if Defendant can demonstrate through law, undisputed facts, or a combination of these that the mark is functional, the registration loses its evidentiary significance. Talking Rain Bev. Co. v. S. Beach Bev. Co., 349 F.3d 601, 603 (9th Cir. 2003) (citing Tie Tech, 296 F.3d at 783). Thus, the principal issue in this case is whether, as a matter of law, Plaintiff's yellow virtual line that appears as an image on a football field during a television or video broadcast of a football game is functional and thus unprotectable. For the reasons set forth below, the Court finds that Defendant's evidence supports the conclusion that Plaintiff's mark is functional; therefore, the Court finds that Plaintiff's presumption of validity has been rebutted.

### 3. Trademark Protection on a Color Mark

To receive trademark protection on a color mark, an applicant must satisfy two conditions.

5

First, the color must not serve a functional purpose. See 15 U.S.C. § 1052(e)(5) (stating that trademark law does not provide protection for a mark which "comprises any matter that, as a whole, is functional"); Qualitex Co. v. Jacobson Products Co., 514 U.S. 159, 165 (stating that a product feature that is functional cannot serve as a trademark); Trademark Manual of Examining Procedure ("TMEP") § 1202.05 (3d ed. 2003) (stating that "a mark is not registrable . . . if the color is functional"). Second, the color must be shown to have attained "secondary meaning" and therefore identifies and distinguishes a particular brand. See Qualitex, 514 U.S. at 163; TMEP § 1202.05. Secondary meaning is acquired when "in the minds of the public, the primary significance of a product feature . . . is to identify the source of the product rather than the product itself." Qualitex, 514 U.S. at 163.

### a. Functionality

Functionality is a judicially-created doctrine that limits the aspects of a product configuration which may be trademarked. The Supreme Court has noted that a color is functional if it is "essential to the use or purpose of the article or if it affects the cost or quality of the article." TrafFix Devices, Inc. v. Mktg. Displays, Inc., 532 U.S. 23, 33 (2001) (citing Qualitex, 514 U.S. at 165). In Qualitex, the court cited examples of how the functionality doctrine has been applied in lower courts: the color green on farm machinery was held to be functional because the customers wanted their farm equipment to match; the color black on outboard boat motors held to be functional because black has special functional attributes of decreasing the apparent size of the motor and of ensuring compatibility with many different boat colors; the color blue in fertilizer was held to be functional because blue indicated the presence of nitrogen. Qualitex, 514 U.S. at 170 (citing Deere & Co. v. Farmhand, Inc., 560 F. Supp. 85, 98 (S.D. Iowa 1982), aff'd, 721 F.2d 253 (8th Cir. 1983); Brunswick Corp. v. British Seagull Ltd., 35 F.3d 1527, 1532 (Fed. Cir. 1994); Nor-Am Chemical v. O. M. Scott & Sons Co., 4 U.S.P.Q.2D (BNA) 1316, 1320 (E.D. Pa. 1987)). The Ninth Circuit has noted that functional features are "features which constitute the actual benefit that the consumer wishes to purchase, as distinguished from an assurance that a particular entity made, sponsored, or endorsed a product." Rachel, 831 F.2d at 1506 (internal quotation marks and citation omitted).

1        Also critical to the functionality inquiry is whether exclusive use of the color would be anti-
2   competitive by depleting alternatives or otherwise putting competitors at "a significant non-reputation-
3   related disadvantage." Qualitex, 514 U.S. at 165; see also Kendall-Jackson Winery, 150 F.3d 1042,
4   1050 (9th Cir. 1998). As noted by the Supreme Court, the functionality doctrine serves an important
5   public policy purpose:

> The functionality doctrine prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from . . . inhibiting legitimate competition by allowing a producer to control a useful product feature. It is the province of patent law, not trademark law, to encourage invention by granting inventors a monopoly over new product designs or functions for a limited time . . ., after which competitors are free to use the innovation. If a product's functional features could be used as trademarks, however, a monopoly over such features could be obtained without regard to whether they qualify as patents and could be extended forever (because trademarks may be renewed in perpetuity).

Qualitex, 514 U.S. at 164; see also Brunswick, 35 F.3d at 1530 ("Because trademark protection is potentially perpetual in duration, protection of a functional trademark would defeat that fundamental right [to compete].").

Moreover, if the asserted product feature, which gives a product its distinctiveness, is the best, or at least one, of a few superior designs for its de facto purpose, then it follows that competition is hindered. Brunswick, 35 F.3d at 1531; see also Sicilia Di R. Biebow & Co. v. Cox, 732 F.2d 417, 427 (5th Cir. 1984) (stating that a "design would be considered de jure functional if it is "the best or one of a few superior designs available") (internal quotation marks omitted).

Further, the existence of alternative designs cannot negate a trademark's functionality. Talking Rain, 349 F.3d at 603. The existence of alternative designs may indicate whether the trademark itself embodies functional or merely ornamental aspects of the product. Id. However, once functionality is established,"there is no need . . . to engage . . . in speculation about other design possibilities . . . ." Talking Rain, 349 F.3d at 603 (quoting TrafFix, 532 U.S. at 33). This prohibition against trademarking functional product features and designs is so strong that, even where a business can prove secondary meaning in a product's design--or features thereof--and likelihood of confusion, its trademark claim will fail if it cannot also establish as a threshold matter that the design is non-functional. See Dorr-

7

Oliver, Inc. v. Fluid-Quip, Inc., 94 F.3d 376, 380 (7th Cir. 1996).

Thus, a color is functional if (1) it affects the quality of the article and (2) puts competitors at a significant non-reputation-related disadvantage.

### i. Quality

Defendant contends that yellow is functional because the color affects the quality of the virtual first-down indicator. A virtual yellow line is easier for viewers to perceive when used against the colors of a football field. (Mot. at 15:1-3.) Plaintiff contends that the selection of yellow was arbitrary, devoid of any utilitarian advantage over other color options. (Opp'n at 11:20-21.)

The color yellow affected the quality of the virtual line service because the quality of the broadcast is affected by the color. The networks determined that yellow is the best or one of the best colors to use against the colors of a football field. In its first technology demonstration to a network, Plaintiff offered ESPN a wide variety of colors and allowed ESPN to chose the color. ESPN, in determining the appropriate color, tested a variety of colors. ESPN had two criterium for selecting the color: the color had to be both visible and non-distracting.  In the course of its testing, ESPN eliminated the colors that did not contrast with the colors of grass and marker lines on the football field – namely, green and white.  ESPN also eliminated red as a potential color because of its tendency to bleed into other colors, its inability to increase its luminance, and its inability to transmit well on television.  ESPN found that only a few colors – namely, yellow, gold, or orange – would be effective for football broadcast because they were readily noticeable to viewers without being a distraction from the game.

Moreover, as between yellow and orange, ESPN had determined that yellow worked better than orange because it contrasted better with the green playing field and was less obtrusive.  ESPN determined that yellow was capable of greater manipulation within the broadcast parameters than orange. For example, yellow was easier to manipulate so that the networks could adjust the color to the unique lighting and field characteristics of each game.  Other networks have selected yellow for similar reasons.  The networks determined that yellow worked better for a first-down line than did any

1  other color. In fact, the networks' discretion over the virtual line's color is evidence that Plaintiff did
2  not use its yellow line as a trademark. Cf. Vuitton, 644 F.2d at 773-74 (finding that element of
3  plaintiff's product design was non-functional in part because plaintiff treated the design element as a
4  trademark from its inception).

5       The Ninth Circuit has observed that "functional features of a product are features which
6  constitute the actual benefit that the consumer wishes to purchase, as distinguished from an assurance
7  that a particular entity made, sponsored, or endorsed a product." Rachel, 831 F.2d at 1506 (internal
8  quotation marks and citation omitted) (emphasis added). Plaintiff did not market itself as the purveyor
9  of the yellow virtual line services to the networks. Here, the virtual line provided the actual benefit
10 that the consumer wished to purchase.

11      Moreover, evidence of the yellow virtual line's nontrademark function is in Plaintiff's contracts
12 with the networks. The color choice was dictated and continues to be dictated by the networks.
13 Plaintiff merely provides the technology that enables the networks to choose the color. Indeed, the
14 network's ability to choose the color was a selling point for the networks.

15      Plaintiff analogizes the facts of this case to Qualitex to argue that yellow is non-functional. In
16 Qualitex, the Supreme Court adopted the district court's finding that the green-gold color of the press
17 pads for use on dry cleaning presses identified the press pads' source and served no other function.
18 Qualitex, 514 U.S. at 166. The district court noted that although it was important to use some color on
19 press pads to avoid noticeable stains, the range of tones of available, which needed not be primary,
20 colors was in the hundreds, if not thousands. Qualitex Co. v. Jacobson Prods. Co., 21 U.S.P.Q.2D
21 (BNA) 1457, 1460 (C.D. Cal. 1991). Thus, the district court found "no competitive need in the press
22 pad industry for the green-gold color, since other colors are equally usable." Id. Plaintiff argues that
23 the facts of this case "are on all fours with Qualitex" because the choice of the color yellow was
24 arbitrary and that yellow was selected from a "rainbow" of choices. (Opp'n at 10:24-11:1.) Plaintiff
25 further contends that ESPN "confirmed that the selection of yellow was an arbitrary, 'subjective
26 creative decision' and that it was plucked from the 'full palette of the rainbow.'" (Opp'n at 12:9-10.)

27
28

1    Qualitex is distinguishable from the present case. First, Plaintiff's argument that this case is "on
2    all fours with Qualitex" is contrary to the record. Unlike the thousands of suitable colors for press
3    pads in Qualitex, as discussed above, the record shows that there are only a few colors considered
4    suitable for football broadcast, namely, yellow, gold, and orange. Second, Plaintiff's argument that
5    ESPN's selection of yellow was an arbitrary, "subjective creative decision" is an incomplete
6    depiction of the record. Although ESPN did state that yellow was a "subjective creative decision,"
7    this "subjective creative decision" was made after ESPN tested the variety of colors Plaintiff
8    presented in its demonstration for its virtual line services.
9    Thus, the Court finds that the color yellow, as applied to the virtual line service, affects the
10   "quality of the article."

**ii. Competition**

12   Defendant argues that yellow confers Plaintiff with a non-reputation related competitive
13   advantage. (Mot. at 16:12-15.) Plaintiff argues that there is no competitive need for yellow because
14   other companies in the virtual line services market were able to compete without providing a yellow
15   line prior to Defendant's entry into the market. (Opp'n at 12:14-13:8.)
16   Here, trademark protection for the color yellow as applied to the first-down service would put
17   competitors at a significant non-reputation-related disadvantage.  This is not a case where yellow is
18   simply ornamental or more attractive. See In re Orange Communications, Inc., 41 U.S.P.Q.2D (BNA)
19   1036, 1042 (T.T.A.B. 1996). Rather, the evidence shows that a vendor who cannot offer yellow as a
20   virtual line is at a competitive disadvantage. ABC stated that, as between two vendors with all
21   product and service components being equal, one vendor's inability to offer yellow as the first and ten
22   line would be a negative factor.  Plaintiff's former CEO recognized that a vendor of the virtual line
23   service who cannot offer yellow is at a competitive disadvantage because "it [is] the color that
24   broadcasters [] asked us [Plaintiff] to make the line."  Likewise, Plaintiff's current CEO stated that, all
25   other things being equal, a vendor's inability to use the color yellow for the virtual first-down line puts
26   that vendor at a competitive disadvantage.  Moreover, since the color yellow provides at least one of

1  a few superior colors for its de facto purpose, it follows that competition is hindered. See Brunswick,
2  35 F.3d at 1531.

3        Plaintiff further contends that any competitive impediment Defendant may encounter is directly
4  related to its reputation. (Opp'n at 14:8-11.) Plaintiff argues that to the extent that a broadcaster has
5  expressed a preference for yellow, it is "impossible to separate from the subjective and reputation
6  related issues." (Opp'n at 14:8-11.) As evidence, Plaintiff cites ESPN's deposition which states that
7  the yellow line is the best color for the first and ten line and it is the color that viewers have come to
8  expect. (See Opp'n at 9:24-15:12.) This evidence, however, does not support Plaintiff's proposition.
9  ESPN's statement merely provides that viewers have come to expect a yellow line to convey where
10 the first down and ten down line is located. Plaintiff provides no other evidence to support its
11 proposition that the network's preference for yellow is due to reputation.

12       Plaintiff also argues that the correct test for functionality is whether the mark leaves alternative
13 designs to the industry that would not prove confusingly similar, citing Clicks Billiards, Inc. v.
14 Sixshooters Inc., 251 F.3d 1252, 1261 (2001) for its proposition. (Opp'n at 11:8-15.) Clicks Billiards
15 involved a trade dress infringement for the decor in billiard halls. The issue was whether the
16 trademark owner presented evidence sufficient to raise an issue of fact that the overall look and feel of
17 the pool hall establishment is nonfunctional to clear the summary judgment hurdle. Clicks Billiards,
18 251 F.3d at 1261-62. The Clicks Billiards court held that the trade owner presented sufficient
19 evidence of the arbitrariness and non-functional nature of its design decisions. The court stated "that
20 the design decisions were made for aesthetic reasons -- and not, for example, because they were the
21 only, the cheapest, or the most efficient way to design a pool hall -- is evidence of nonfunctionality."
22 Clicks Billiards, 251 F.3d at 1262. The Clicks Billiards court also found that there were alternatives
23 in the industry. However, this assessment was made after the trademark holder had established that its
24 trade dress was arbitrary and non-functional. See Clicks Billiards, 251 F.3d at 1261 & n.5. Here,
25 however, Plaintiff has not established that its trade dress is arbitrary or non-functional. As discussed
26 above, once functionality is established, there is no need to engage in speculation about other design

28       11

possibilities. See Talking Rain, 349 F.3d at 603

Thus, to limit competitors' options by allowing Plaintiff exclusive appropriation of one of the most marketable colors would cause "significant non-reputation-related disadvantage" to competitors.

The Court finds that Defendant has rebutted the presumption of validity endowed by Plaintiff's PTO registration. Since this mark is functional, Plaintiff's registration loses its evidentiary significance. The Court also finds that Plaintiff has failed to offer sufficient evidence to create a genuine issue of material fact that its mark is not functional.

**b. Secondary Meaning**

As noted above, even where a business can prove secondary meaning in a product's design, its trademark claim will fail if its design is functional. Thus, given the Court's finding that Plaintiff's mark is functional, the Court need not address secondary meaning.

**B. Likelihood of Confusion**

The Court is likewise free to conclude its inquiry without examining the likelihood of confusion doctrine as a result of its finding that Plaintiff's mark is functional. However, the Court nevertheless examines this final infringement inquiry to address Defendant's additional contentions that Plaintiff cannot satisfy its burden to prove likelihood of confusion between the two virtual first-down line services.

Both Plaintiff and Defendant agree that there is no evidence of actual confusion. Thus, the principal issue is whether there is likelihood of confusion. Defendant argues that there is no likelihood of confusion between Defendant's and Plaintiff's use of the color yellow for virtual first-down line service. Plaintiff argues that the facts support a finding of likelihood of confusion. In determining whether likelihood of confusion exists, the Court must look at the facts in the light most favorable to Plaintiff.

Likelihood of confusion is "the central element of trademark infringement." GoTo.com, Inc. v. Walt Disney Co., 202 F.3d 1199, 1205 (9th Cir. 2000). Likelihood of confusion "exists when customers viewing the mark would probably assume that the product or service it represents is

associated with the source of a different product or service identified by a similar mark." Lindy Pen Co. v. Bic Pen Corp., 725 F.2d 1240, 1243 (9th Cir. 1984) (emphasis added); see also Fuddruckers, 826 F.2d at 845 (noting that the potential for harm is equally great if consumers believe that "Doc's [the alleged infringer] runs Fuddruckers [the original user], and they are disappointed with the quality of Doc's food or service [such that] they may be deterred from patronizing Fuddruckers.").

The Ninth Circuit has set forth a multi-factor test for determining whether a likelihood of confusion exists: (1) strength of the mark, (2) similarity of services, (3) similarity of the marks, (4) evidence of actual confusion, (5) marketing channels used, (6) type of goods or services and the degree of care likely to be exercised by the purchaser, (7) defendant's intent in selecting the mark, and (8) likelihood of expansion of the product lines. Sleekcraft Boats, 599 F.2d at 348-49. The enumerated test is merely a helpful guideline in the ultimate determination of whether there is likelihood of confusion. See Eclipse Associates, 894 F.2d at 1118. The determination of each factor is a finding of fact. Alpha Industries, Inc. v. Alpha Steel Tube & Shapes, Inc., 616 F.2d 440, 443-44 (9th Cir. 1980). But the further determination of likelihood of confusion based on those factors is a legal conclusion. Id. (citing J. B. Williams Co., Inc. v. Le Conte Cosmetics, Inc., 523 F.2d 187, 191-92 (9th Cir. 1975) and Sleekcraft Boats, 599 F.2d at 348-54).

The Court notes that the parties are not in dispute with respect to the similarity of the marks, similarity of services, similarity of markets, and degree of care likely to be exercised by the purchaser. Since the marks, services, and markets are similar, these factors weigh in in a finding of likelihood of confusion. However, the purchasers are sophisticated and exercise a great degree of care in selecting their virtual first-down line service provider. This factor weighs against a likelihood of confusion. The Court will address the remaining factors as presented by the parties.

**1. Strength of Plaintiff's Mark**

A strong mark is inherently distinctive and will be afforded the widest ambit of protection from infringing uses. Sleekcraft Boats, 599 F.2d at 349. As set forth above, Plaintiff's mark is functional. As such, Plaintiff mark is not strong, and this factor weighs against a likelihood of

confusion.

### 2. Evidence of Actual Confusion

Evidence of actual confusion is not necessary to prevail on an infringement claim. See Academy of Motion Picture Arts & Sciences v. Creative House Promotions, Inc., 944 F.2d 1446, 1456 (9th Cir. 1991) (stating that "actual confusion is not necessary to a finding of likelihood of confusion under the Lanham Act"). However, proof of actual confusion "is persuasive proof that future confusion is likely." Sleekcraft Boats, 599 F.2d at 352.

Plaintiff contends that although there is no confusion by the actual purchaser, there is likelihood of confusion from the viewpoint of a potential consumer of its services. (Opp'n at 18:14-19:2.) Plaintiff further contends that since there are multiple market tiers in this case, the Court should take into account potential post-purchase confusion by both the broadcaster and broadcast viewers. (Opp'n at 19:3-10.) Plaintiff's, however, has not presented any evidence in support of either of its contentions. With respect to Plaintiff's first contention, Plaintiff states:

> if this Court finds that a potential consumer, knowing the significance of the color yellow as a source identifier of Sportvision, views the activities of Defendant and mistakenly assumes that Sportvision is the source of the service, that is compelling evidence of a likelihood of confusion. Sportvision has recently received strong indications that this precise scenario has in fact occurred and is working to develop its evidence for trial.

(Opp'n at 18:20-19:2.) This bare allegation is insufficient to support a finding of likelihood of confusion at the summary judgment phase. Moreover, a finding of likelihood of confusion requires that confusion be probable, not just a possibility. Rodeo Collection, Ltd. v. West Seventh, 812 F.2d 1215, 1217 (9th Cir. 1987).

Likewise, with respect to Plaintiff's second contention, Plaintiff has not offered any evidence of post-purchase confusion by broadcasters or broadcast viewers. For example, in Academy of Motion Picture Arts & Sciences, the case which Plaintiff relies for its post-purchase confusion proposition, the plaintiff offered survey evidence that the "secondary audience" (e.g., the recipient of the "Oscar" look-alike statuette and individuals who see the award after it is presented) might conceivably assume the defendant is somehow associated with the real Oscar. Academy of Motion

14

Picture Arts & Sciences, 944 F.2d at 1455-56 (noting that the survey showed that "70% of white-collar professionals associated the [defendant's award] with the Oscar"). Plaintiff has not offered evidence of post-purchase confusion. At the summary judgment stage, Plaintiff may not rely on mere allegations in the pleadings in order to oppose summary judgment. T.W. Electrical Service, 809 F.2d at 630. As such, this factor weighs against a likelihood of confusion.

### 3. Defendant's Intent in Selecting the Mark

Defendant argues that there is no bad faith intent because the networks, not Defendant, selected the color for the virtual first-down line. (Mot. at 23:17-18.) Plaintiff contends that Defendant intended to benefit from the goodwill earned by Plaintiff. (Opp'n at 21:3-12.) As evidence of Defendant's intent, Plaintiff cites Defendant's 2003 correspondence with ABC, where Defendant states: "how do you feel about the color? SMT [SportsMEDIA Technology Corporation] would sure like to air a virtual line that looks like it belongs in the ABC telecast." (Opp'n at 21:4-7 (brackets in original).) In response to ABC's inquiry as to whether an orange line with a sort of yellowish tint could be used, Defendant stated that it could make its line any color in the rainbow, with any tint ABC wanted.

The Sleekcraft court has noted that when one party knowingly adopts a mark similar to another's, the reviewing courts presume that the defendant will accomplish its purpose, and that the public will be deceived. Sleekcraft Boats, 599 F.2d at 354. In the present case, as discussed above, the broadcasters had discretion and specified the color of the virtual first-down line for services provided by both Plaintiff and Defendant. Plaintiff's evidence of Defendant's intent does not support a finding that Defendant intended that the potential purchaser confuse or associate Plaintiff's virtual yellow line with Defendant's virtual yellow line. This factor is less probative of the likelihood of confusion. See Sleekcraft Boats, 599 F.2d at 354 (stating that "[g]ood faith is less probative of the likelihood of confusion, yet may be given considerable weight in fashioning a remedy").

In light of the foregoing, the Court finds that no likelihood of confusion exists between the parties' virtual first-down line services.

//

15

## V. CONCLUSION

For the reasons set forth above, the Court GRANTS Defendant's Motion for Partial Summary Judgment on the trademark issues.

**Dated: August 4, 2005**       /s/ James Ware
04cv3115sj-tm                   **JAMES WARE**
                                **United States District Judge**

**THIS IS TO CERTIFY THAT COPIES OF THIS ORDER HAVE BEEN DELIVERED TO:**

Larry Vierra  lvierra@vmmhd.com
Burt Magen  bmagen@vmmhd.com
Laura L. Carroll  lcarroll@burnslev.com
Merton E. Thompson  mthompson@burnslev.com
Doyle B. Johnson  dbjohnson@reedsmith.com
John P. Bovich  jbovich@reedsmith.com
Kerry Hopkins  khopkins@reedsmith.com
Scott D. Baker  sbaker@reedsmith.com
Matthew H. Adler  adlerm@pepperlaw.com
Nathan W. Dean  deann@pepperlaw.com
Vincent V. Carissimi  carissimiv@pepperlaw.com

Dated: August 4, 2005                               **Richard W. Wieking, Clerk**

                                                    **By:/jwchambers/**
                                                        **Ronald L. Davis**
                                                        **Courtroom Deputy**

17