IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| Sportvision, Inc., | NO. C 04-03115 JW |
| Plaintiff, | |
| v. | **CLAIMS CONSTRUCTION ORDER; ORDER SETTING CASE MANAGEMENT CONFERENCE** |
| SportsMEDIA Technology Corp., | |
| Defendant. | |

## I. INTRODUCTION

Plaintiff Sportvision, Inc. ("Sportvision") initiated this lawsuit against Defendant SportsMEDIA Technology Corporation ("SportsMEDIA") for patent infringement, trademark infringement and unfair competition. SportsMEDIA answered and asserted counterclaims of non-infringement, invalidity, unenforceable, and inequitable conduct. Jurisdiction is proper pursuant to 28 U.S.C. §1338(a), and venue is proper pursuant to 28 U.S.C. §1391(b)(1). The Court conducted a claims construction hearing on May 13, 2005. This Order sets forth the Court's construction of the terms and phrases at issue.

## II. BACKGROUND

Sportvision is a corporation organized and existing under the laws of Delaware having a principal place of business in Chicago, Illinois, and offices in Mountain View, California and New York, New York. Sportvision is engaged in, among other things, providing sports broadcasters first

down marker technology, as well as the manufacture and sale of video graphics effects equipment and software. SportsMEDIA is a corporation organized and existing under the laws of Delaware and having a principal place of business in Durham, North Carolina. SportsMEDIA provides realtime graphics and interface services and products to the live sports television production industry.

At issue are the rights to a virtual yellow line first-down marker used in football game broadcasts. There are currently three major vendors that provide the virtual first-down line technology to television networks: Sportvision, SportsMEDIA, and PVI Virtual Media Services, LLC. However, Sportvision maintains that it has historically provided sophisticated high-end 3D graphics insertion technology such as the famous Yellow Line Virtual 1st and Ten Line down marker for National Football League broadcasts and the virtual strike zone (K-Zone) in Major League Baseball broadcasting. (First Amended Complaint, hereafter, "FAC" ¶ 16.)

In the Fall of 2003, Sportvision became aware that SportsMEDIA was providing a virtual yellow first-down indicator to certain college football broadcasts. Sportvision advised SportsMEDIA of its intellectual property rights and requested that SportsMEDIA not infringe those rights. Sportvision then learned in June of 2004 that SportsMEDIA had offered an allegedly infringing service for the 2004 ABC Monday Night Football schedule. Again, Sportvision demanded that SportsMEDIA cease the alleged infringement. (FAC ¶ 17.)

On July 30, 2004, Sportvision initiated the instant suit. Sportvision alleges that SportsMEDIA had numerous opportunities to view the deployment, operation, presentation and functioning of Sportvision's technology by virtue of being present at the same broadcast events and servicing the same customers. (FAC ¶ 17.) As the result, SportsMEDIA developed and began offering a competitive video graphic insertion product that is wholly derivative of the Sportvision Yellow Line system. Sportvision alleges that SportsMEDIA technology has like capabilities and functionality, and features an identical yellow line designation in its patents. (FAC ¶ 18.)

Accordingly, Sportvision claims infringement of one or more claims of the following U.S. patents: No. 6,229,550, entitled "Blending a Graphic" ("the '550 patent") issued on May 8, 2001 and

2

1  is assigned Sportvision; No. 5,917,553, entitled "Method and Apparatus for Enhancing the
2  Broadcast of a Live Event" ("the '553 patent") issued on June 29, 1999 and is assigned to Fox Sports
3  Productions Inc., Los Angeles, Ca.[1]; and No. 6,597,406, entitled "System for Enhancing a Video
4  Presentation of a Live Event" ("the '406 patent") issued on July 22, 2003 and is assigned to
5  Sportvision.

6  Sportvision alleges that by virtue of SportsMEDIA's infringement, the companies are now
7  direct competitors for certain video graphic insertion systems and services in the United States,
8  including Sportvision's Virtual First & Ten Line.

9  On May 13, 2005, the Court conducted a hearing to construe the disputed terms and phrases
10 contained in the three patents.

### III.  STANDARDS

12 Claim construction is purely a matter of law, to be decided exclusively by the Court.
13 Markman v. Westview Instruments, Inc., 517 U.S. 370, 387 (1996).  Claims are construed from the
14 perspective of a person of ordinary skill in the art at the time of the invention.  Markman v.
15 Westview Instruments, Inc., 52 F.3d 967, 986 (Fed. Cir. 1995).  To determine the meaning of the
16 claim terms, the Court initially must look to intrinsic evidence, that is, the claims, the specification,
17 and, if in evidence, the prosecution history.  Autogiro v. United States, 384 F.2d 391 (Ct. Cl. 1967).
18 The Court must look first to the words of the claims themselves.  See Vitronics Corp. v.
19 Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996).  These words are to be given their ordinary
20 and customary meaning unless it is clear from the specification and prosecution history that the
21 inventor used the term with a different meaning.  Id.  The claims should be interpreted consistently
22 with the specification.  See Renishaw PLC v. Marposs Societa' per Azioni, 158 F.3d 1243, 1250
23 (Fed. Cir. 1998).

---

[1] As part of its Answer, SportsMEDIA seeks a declaration from this Court that Sportvision lacks standing to sue under the '553 patent because, among other things, it is not the true owner of the patent and has not received all substantial rights in the '553 patent. On motion, the Court will address this issue in a separate order.  (See Docket Item No. 49, Defendant's Answer ¶ 64.)

3

1  Where intrinsic evidence alone resolves any ambiguity in a disputed claim term, it is
2  improper to rely on evidence which is external to the patent and file history. Vitronics, 90 F.3d at
3  1583, 1585.  However, extrinsic evidence may be considered in the rare instances where the intrinsic
4  evidence is insufficient to enable the court to construe disputed claim terms. Id. at 1585.  Common
5  sources of extrinsic evidence include expert testimony, inventor testimony, dictionaries, and
6  technical treatises and articles. Id. at 1584.

## IV.  DISCUSSION

The disputed terms and phrases are contained in the three patents which are set forth immediately below: (the disputed terms and phrases are set in bold)

**The '553 Patent**

   **Claim 56**

   A method of adding a graphic indication of a first down to a video of a football game during a **broadcast** of said football game, comprising the steps of:

   **selecting a position in a first video frame** corresponding to a location on a football field representing said first down;

   adding a line to said first video frame at said selected position, said step of adding a line includes using a processor to draw said line at a **proper orientation in light of said football field's orientation in said first video frame**; and

   adding lines to successive video frames at positions corresponding to said location on said football field representing said first down, said step of adding lines to successive video frames includes using said processor to draw said lines at **proper orientation in light of said football field's orientation in said successive video frames**.

**The '550 Patent**

   **Claim 1**

   A method for **blending**[2] images, comprising the steps of selecting a first portion of a first image, said first portion of said first image includes different color values;

   storing **information about said different color values**;

   receiving a first video image after said step of selecting;

---

   [2] According to the Joint Claim Construction Chart, the terms blending, inclusion, exclusion, inclusion criteria, exclusion criteria appear in multiple claims.  "Blending" occurs in claims 1-18, 27, 38, and 50.  "Inclusion" occurs in claims 16-18 and 50.  "Exclusion" occurs in claims 18 and 50. (See Docket Item No. 143 at 4.)

4

accessing color data for said first video image;

comparing said color data to said stored information about said different color values; and

**blending** a second image with said first video image at least partially based on said step of comparing.

**Claim 16**

A method according to claim 1, further including the step of:

creating an **inclusion** based on said first portion of said first image, said step of storing includes storing said **inclusion**.

**Claim 18**

A method according to claim 16, further including the steps of:

selecting a second portion of said first image or another image; and

creating an **exclusion** based on said portion.

**Claim 50**

A method for **blending** images, comprising the steps of:

receiving video of an environment;

selecting a first region in said video, said first region includes a first set of different color values;

creating **inclusion criteria** describing said first set of different color values;

selecting a second region in said video, said second region includes a second set of one or more color values;

creating **exclusion criteria** describing said second set of one or more color values, said first set of color values **overlap** with said second set of color values;

identifying a target area in said video after said steps of creating **inclusion** criteria and creating **exclusion criteria**;

comparing said color data for said target area to said **inclusion criteria** and said **exclusion criteria**; and

**blending** a graphic with said target area at least partially based on said inclusion criteria and said exclusion criteria.

//

**The '406 Patent**

**Claim 1**

A method of adding a graphic to a video representation of an environment, said method comprising the steps of:

(a) **determining a set of three dimensional coordinates using information identifying a position in said environment and a three dimensional model of at least a portion of said environment**, wherein said set of three dimensional coordinates corresponds to said position and includes at least one three dimensional coordinate not listed in said information;

(b) **converting said set of three dimensional coordinates into a set of two dimensional positions** in said video representation; and

(c) enhancing said video representation with said graphic in an area based on said set of two dimensional positions.

**Claim 70**

An apparatus comprising:

a set of one or more field view sensors adapted to sense **field of view information from a camera**;

one or more storage devices; and

one or more processors in communication with said one or more storage devices and said set of one or more **field view sensors**, said one or more processors perform a method of adding a graphic to a video representation of an environment originating from said camera, said method comprising the steps of:

(a) receiving information that identifies a position in said environment for said graphic;

(b) **determining a set of three dimensional coordinates using said information and a three dimensional model of at least a portion of said environment**, wherein said set of three dimensional coordinates corresponds to said position and includes at least one three dimensional coordinate not listed in said information;

(c) converting said set of three dimensional coordinates into a set of two dimensional positions in said video representation; and

(d) enhancing said video representation with said graphic in an area based on said set of two dimensional positions.

Applying the standards for claims construction, the Court gives the following construction to the terms and phrases at issue:

6

**Claims of The '553 Patent**

**A.     "broadcast"**

Claim 56 of the '553 patent provides:

> A method of adding a graphic indication of a first down to a video of a football game during a **broadcast** of said football game, comprising the steps of. . . .

Sportvision contends that the term "broadcast" does not need to be construed.

SportsMEDIA contends that the Court should define "broadcast" as "distribution of video content." (Defendant and Counterclaimant's Memorandum of Points and Authorities in Opposition to Plaintiff's Markman Memorandum on Claim Construction, hereafter, "SportsMEDIA's Memo," Docket Item No. 178, at 11.).

In response to SportsMEDIA's proposed construction, Sportvision contends that if the Court is going to construe the term, it should be construed to mean, "transmission for public use." (Sportvision's Markman Memorandum on Claim Construction, hereafter, "Sportvision's Memo," Docket Item No. 173, at 7.)

The noun "broadcast" appears in many places in the specification of the '553 patent. Generally the term is used in the context of (a) "... broadcast of a live event ..." or (b) "... broadcast of a target at a live event ..." '553 patent, 2:15-17. The common definition of the term is, "a wide-spread distribution." SportMEDIA's proposed construction is more limiting than the common definition of the term.

The Court gives the noun "broadcast" its commonly understood meaning: "A wide-spread distribution."

**B.     "selecting a position in a first video frame"**

Claim 56 of the '553 patent provides:

> A method of adding a graphic indication of a first down to a video of a football game during a broadcast of said football game, comprising the steps of:
>
> **selecting a position in a first video frame** corresponding to a location on a football field representing said first down . . .

**United States District Court**
For the Northern District of California

7

1    Sportvision contends that phrase "selecting a position in a first video frame" need not be
2 construed.
3    SportsMEDIA seeks to construe the phrase as "manually identifying a position in a first
4 video frame using a pointing device, such as a mouse or light pen." (SportsMEDIA's Memo at 11.)
5    In response, Sportvision proposes as an alternative, "choosing a position in a first video
6 frame" as a counter-point to SportsMEDIA's proposed construction. (Sportvision's Memo at 8.)
7    It appears to the Court that both parties are merely proposing substitute terms for the
8 operative term "selecting." SportsMEDIA wishes the Court to substitute "manually identifying" for
9 the term "selecting." Sportvision asks the Court to substitute "choosing" for the term "selecting."
10 The ordinary meaning of the term "selecting" is "identifying or designating." In the context of the
11 patent, "selecting a position in a first video frame" is to identifying or designating a location in a
12 video frame which corresponds to a location on the physical football field.
13    The plain language of Claim 56 is not limited to "manually identifying" a position or
14 location. In contrast, Claim 49 discloses a method for adding a graphic indication of a first down to
15 a video of a football game by, in relevant part, storing an indication of "a location" corresponding to
16 the first down and by then finding "said location's" position in the video. Claim 51, which depends
17 from Claim 49, adds the following limitation to the method in Claim 49: "**manually selecting** said
18 location." Thus, in Claim 51, the patentee claims a particular method for designating a location for
19 adding a graphic line, i.e, "manually selecting." However, no limitation on "selecting" is present in
20 Claim 56. Therefore, the Court declines to limit "selecting" in Claim 56 to "manually identifying."
21    The Court gives the phrase "selecting a position in a first video frame" its ordinary and
22 customary meaning, "identifying or designating a position in a first video frame."

**C.    "proper orientation(s) in light of said football field's orientation in said first [successive] video frame(s)"**

Claim 56 of the '553 patent provides:

> A method of adding a graphic indication of a first down to a video of a
> football game during a broadcast of said football game, comprising the steps
> of:

8

> selecting a position in a first video frame corresponding to a location on a football field representing said first down;
>
> adding a line to said first video frame at said selected position, said step of adding a line includes using a processor to draw said line at a **proper orientation in light of said football field's orientation in said first video frame**; and
>
> adding lines to successive video frames at positions corresponding to said location on said football field representing said first down, said step of adding lines to successive video frames includes using said processor to draw said lines at **proper orientation in light of said football field's orientation in said successive video frames**.

Sportvision contends that the phrase should be construed as: "A line drawn such that the line appears to be in correct relation and alignment to the actual surface features and alignment of the football field as it appears in the video frame." (Sportvision's Memo at 9.)

SportMEDIA contends that the phrase should be construed as: "The orientation of the line that is drawn is determined based on direct reference to the football field's orientation in the first [successive] video frame(s), where the football field's orientation is determined by reference to either the camera's field of view data, including the location of the camera, and/or by using pattern recognition analysis." (SportsMEDIA's Memo at 14.)

Sportvision's construction imports limitation such as "actual surface features" to the claim. SportsMEDIA's construction imports other limitations such as using field of view data and using pattern recognition.

The Court finds that neither of the limitations proffered by the parties can be properly read into the phrase. Claims 49 to 55 use these limitations in claims dependent upon Claim 49.

Accordingly, the Court construes the phrase as: "Adding line(s) in correct alignment to the football field as the added line(s) and field appear in the video frame(s)."

//

9

**Claims of The '550 Patent**

**A.      "Blending"**

   Claim 1 of the '550 patent claims:

   > A method for **blending** images, comprising the steps of selecting a first portion of a first image, said first portion of said first image includes different color values. . .

   Sportvision contends the term "blending" should be construed as: "Combining at least a first image or video with at least a second image or video such that the result includes all or part of the first image or video and all or part of the second image or video."  (Sportvision's Memo at 13.)

   SportsMEDIA proposes that the term be construed as: "Combining at least a first image or video with at least a second image or video such that the result includes all or part of the first image or video and all or part of the second image or video, for example, using a keyer to key one video over another video."  (SportsMEDIA's Memo at 16.)

   Both parties essentially agree on the definition, except that SportsMEDIA's definition includes "...using a keyer to key one video over another video."  The Court finds it inappropriate to add SportsMEDIA's proffered additional language.  The specification discloses other ways of accomplishing the effect of blending.  SportsMEDIA's proffered construction would single out one particular embodiment.  The '550 patent describes the use of computers in the "blending" process, rather than keyers.  '550 patent, 4:34, 37-40.

   Accordingly, the Court construes the meaning of the term "blending" to be: "Combining at least a first image or video frame with a second image or second video frame such that the result includes all or part of both."

**B.      "Information about said different color values"**

   Claim 1 of the '550 patent claims:

   > A method for blending images, comprising the steps of selecting a first portion of a first image, said first portion of said first image includes **different color values**;
   >   storing **information about said different color values**.. .

10

1    Sportvision contends that the phrase should be construed as: "At least one piece of
2 information corresponding to a color value and at least a second piece of information corresponding
3 to different color value." (Sportvision's Memo at 14.)
4    SportsMEDIA proposes that the phrase be construed as: "A set of characteristics that
5 describe a class of pixels." (SportsMEDIA's Memo at 17.)
6    Claim 1 discloses steps in a method for blending images. The method discloses selecting a
7 portion of a first image, where the selected portion includes different "color values." The written
8 description of the '550 patent refers to "color values" as follows:

> The establishment of inclusions and exclusions in embodiments of the present invention provides for making fine distinctions between luminance and color values that are very close, where it is critical to modify pixels with one luminance-color combination and not modify pixels with another combination. Such circumstances arise during the rendering of a first down line, as described above, when the appearance of a player's uniform is very similar to the field. For example, an inclusion may describe the green color of grass while an exclusion might describe a different shade of green used on a player's uniform. A traditional chroma key system lacks the ability to make such distinctions, since it merely provides for replacing a predetermined color.

'550 patent, 20:4-16.

Thus, the Court construes the term "color values" to mean luminance and or chrominance. Color values do not contain position information.

The phrase "different color values" refers to color values within the selected portion, i.e., one color value in the selected portion is different from another color value in the selected portion. Thus, at this step in the patented method, the only information which is stored are the color values, and nothing else.

Accordingly, the Court defines the phrase "information about said different color values" to mean: "Luminance information or chrominance information or both in a selected portion of an image."

//

**C.     "Exclusion" and "exclusion criteria"**

Claims 18 and 50 of the '550 patent claim:

Claim 18:

>   A method according to claim 16, further including the steps of:
>       selecting a second portion of said first image or another
>           image; and
>       creating an **exclusion** based on said portion.

Claim 50:

>   A method for blending images, comprising the steps of:
>
>       receiving video of an environment;
>
>       selecting a first region in said video, said first region includes a first
>           set of different color values;
>
>       creating inclusion criteria describing said first set of
>           different color values;
>
>       selecting a second region in said video, said second region includes a
>           second set of one or more color values;
>
>       creating **exclusion criteria** describing said second set of one or more
>           color values, said first set of color values overlap with said
>           second set of color values;
>
>       identifying a target area in said video after said steps of creating
>           inclusion criteria and creating **exclusion criteria**;
>
>       comparing said color data for said target area to said inclusion criteria
>           and said **exclusion criteria**; and
>
>       blending a graphic with said target area at least partially based on said
>           inclusion criteria and said exclusion criteria.

Sportvision's definition is "An exclusion is a set of characteristics that describe a class of pixels that cannot be modified in video." (Sportvision's Memo at 15.)

SportsMEDIA's definition is "A set of characteristics that describe a set of pixels that are not to be modified in the video." (SportsMEDIA's Memo at 19.)

The written description provides the following definition for the term:

> An exclusion is a color range for a pixel that should not be enhanced using the present invention. During operation, the operator can set up one or more inclusions and/or one or more exclusions. For example, the operator may decide that a yard line can be drawn over white (the original yard lines), green (grass) and brown (dirt). Additionally, the operator may want to set up an exclusion so that a line is not drawn over a specific color (e.g. team's

12

uniforms). In an alternate embodiment of the present invention, exclusions also include video frame pixel locations that are not to be enhanced.

'550 patent, 9:6-16.

This description defines "exclusion" as (a) a color range which specifies whether a pixel cannot be modified, or (b) a color range which specifies whether a pixel cannot be modified **and** a video frame location which cannot be modified. Definition (a) has one criterium for determining whether a pixel color value can be modified and definition (b) has two criteria (color range and location). Sportvision's definition only covers case (a). SportsMEDIA's definition only covers the case in which pixel locations for exclusion are stored.

Consistently with the specification, the Court defines the term "exclusion" to mean: "A color range or a color range in combination with pixel locations that determines which pixels are not to be enhanced."

**Claims of the '406 Patent**

**A.    "Determining a set of three dimensional coordinates using information identifying a position in said environment and a three dimensional model of at least a portion of said environment"**

Claim 1 of the '406 patent claims:

A method of adding a graphic to a video representation of an environment, said method comprising the steps of:

(a) **determining a set of three dimensional coordinates using information identifying a position in said environment and a three dimensional model of at least a portion of said environment**, wherein said set of three dimensional coordinates corresponds to said position and includes at least one three dimensional coordinate not listed in said information;

(b) converting said set of three dimensional coordinates into a set of two dimensional positions in said video representation; and

(c) enhancing said video representation with said graphic in an area based on said set of two dimensional positions.

Sportvision contends the phrase should be construed as: "A set of three data values that together identify a location are determined based on data about a position, and a model that describes at least a portion of the environment seen in the video." (Sportvision's Memo at 17.)

13

1   SportsMEDIA proposes the following construction: "Determining a set of three dimensional
2   coordinates using information identifying a position in said environment and a three dimensional
3   model of at least a portion of said environment." (SportsMEDIA's Memo at 20.)

4   The '406 patent description calls for the three dimensions to be represented by the letters x, y,
5   and z:

> In one embodiment, each data point includes x, y and z values. Any method can be used to obtain these x, y and z values. One example of a suitable method is to use a laser plane for z values and a laser range finder for x and y values, or other surveying devices.

8   '406 patent, 9:36-43.
9   This description is also a common convention in geometry.

10  Accordingly, the Court construes the phrase to mean: "Determining a set of three-
11  dimensional coordinates (x, y, z), using information identifying a position in the environment and
12  using a three-dimensional model (represented in x, y and z coordinates) of at least a portion of the
13  environment."

14  **B.   "Converting said set of three dimensional coordinates into a set of two dimensional positions"**

15  Claim 1 of the '406 patent claims:

16  A method of adding a graphic to a video representation of an environment, said method comprising the steps of:

18  (a) determining a set of three dimensional coordinates using information identifying a position in said environment and a three dimensional model of at least a portion of said environment, wherein said set of three dimensional coordinates corresponds to said position and includes at least one three dimensional coordinate not listed in said information;

21  (b) **converting said set of three dimensional coordinates into a set of two dimensional positions** in said video representation; and

23  (c) enhancing said video representation with said graphic in an area based on said set of two dimensional positions.

24  Sportvision contends the phrase should be construed as: "Mathematically converting the set
25  of three data values that together identify a location into a set of two data values that together
26  identify a position." (Sportvision's Memo at 19.)

United States District Court
For the Northern District of California

1  SportsMEDIA proposes: "Mathematically converting the set of three dimensional real world
2  space coordinates (x, y, z) into a set of two dimensional positions."  (SportsMEDIA's Memo at 23.)
3  The Court construes this phrase to mean:  "Mathematically converting the set of three-
4  dimensional coordinates (x, y, z) into a set of two-dimensional positions.  The two-dimensional
5  positions have x and y coordinates."

**C.      "Field view sensors"**

Claim 70 reads:

> An apparatus comprising:
>
> > a set of one or more **field view sensors** adapted to
> > sense field of view information from a camera . . .

Sportvision defines the phrase as: "Sensors that provide information about that which is viewed by the camera [adapted to sense]."  (Sportvision's Memo at 20.)

SportsMEDIA contends that this phrase is vague, indefinite and incapable of construction, as the phrase is not used in the patent and does not have a known standard meaning.  (SportsMEDIA's Memo at 24.)

The '406 patent does not directly identify what "field view sensors" are.  However, given the limitations in Claim 70, the Court finds that one skilled in the art would have known what field view sensors are.

The specification provides:

> A set of camera view sensors can include one or more of the following:  a zoom sensor, a pan sensor and/or a tilt sensor.

'406 patent, 5:40-42.

From the claim language and specification, the Court finds that these sensors are used to obtain view of field information from the camera(s).

Though the Court is satisfied that the intrinsic record is sufficient to define "field view sensors," the Court refers to extrinsic evidence to resolve any doubt with respect to the exact meaning of the phrase.  Vitronics, 90 F.3d at 1583, 1585; Digital Biometrics Inc. v. Identix Inc., 149

1  F.3d 1335 (Fed. Cir. 1998) (extrinsic evidence may be considered to enable the court to construe

2  disputed claim terms.)  In the CROSS-REFERENCES TO RELATED APPLICATIONS section of

3  the '406 patent specification, the 5,917,553 patent (A Method And Apparatus For Enhancing The

4  Broadcast Of A Live Event) is included by reference.  The '553 patent describes "field of view

5  sensors" as:

> One embodiment of the present invention includes one or more field of view sensors
> coupled to a camera such that the sensors can detect data from which the field of view
> of the camera can be determined. The field of view sensors could include pan, tilt
> and/or zoom sensors.

'553 patent, 2:33-37.

10   Accordingly, the Court construes the term "field view sensors" to mean:  "Sensors that

11  provide information about the area being viewed by the camera."

12  **D.      "Field of view information from a camera"**

13   Claim 70 of the '406 Patent claims:

14   An apparatus comprising:

15        a set of one or more field view sensors adapted to sense **field of view information from a camera**;

16        one or more storage devices; and

17

18        one or more processors in communication with said one or more storage devices and said set of one or more field view sensors, said one or more processors perform a method of adding a graphic to a video representation of an environment originating from said camera, said method comprising the steps of . . .

21   Sportvision contends the phrase should be defined as: "Information about which is viewed by

22  the camera."  (Sportvision's Memo at 21.)

23   SportsMEDIA proposes: "Information describing the pan, tilt and/or zoom of the camera,

24  and the location of the camera."  (SportsMEDIA's Memo at 25.)

25   "Field of view information" is "information" (or "data" as described in the '553 patent)

26  which is used to determine the field of view of the camera. (See Section C above).  The '553 patent

27  refers to "field of view information" in the same context as "field of view data":

> The signal sent by multiplexer 206 to processor 200 includes the information from the field of view sensors.

'553 patent, 6:60-62.

> Simultaneously with step 300, pan, tilt and zoom data (field of view data) is sensed in step 302 and the field of view is determined in step 304.

'553 patent, 8:21-24.

Accordingly, the Court construes the term "field of view information from a camera" to mean: "Information from at least one field view sensor, which can be used to determine what the camera sees."

### V.  CONCLUSION

The parties shall meet and confer to develop a joint case management statement to address further proceedings in the case, which shall be filed no later than **March 13, 2006.**  The Court will conduct a case management conference on **March 27, 2006 at 10 a.m.**

Dated: February 17, 2006

JAMES WARE
United States District Judge

**THIS IS TO CERTIFY THAT COPIES OF THIS ORDER HAVE BEEN DELIVERED TO:**

Larry Vierra  lvierra@vmmhd.com
Burt Magen  bmagen@vmmhd.com
Laura L. Carroll  lcarroll@burnslev.com
Merton E. Thompson  mthompson@burnslev.com
Doyle B. Johnson  dbjohnson@reedsmith.com
John P. Bovich  jbovich@reedsmith.com
Kerry Hopkins  khopkins@reedsmith.com
Scott D. Baker  sbaker@reedsmith.com
Matthew H. Adler  adlerm@pepperlaw.com
Nathan W. Dean  deann@pepperlaw.com
Vincent V. Carissimi  carissimiv@pepperlaw.com

Dated: February 17, 2006                    Richard W. Wieking, Clerk

By:   /s/ JW Chambers
      **Melissa Peralta**
      **Courtroom Deputy**